590 A.2d 1171

NEWARK BETH ISRAEL MEDICAL CENTER, PLAINTIFF-RESPONDENT, v. GRUZEN AND PARTNERS, D/B/A GRUZEN, SAMTON, STEINGLASS, ARCHITECTS, DEFENDANT AND THIRD-PARTY PLAINTIFF-APPELLANT.

ISADORE AND ZACHARY ROSENFIELD, ASSOCIATED ARCHITECTS, D/B/A THE ROSENFIELD PARTNERSHIP, DEFENDANT-APPELLANT, v. LEV ZETLIN ASSOCIATES, INC., THIRD-PARTY DEFENDANT-RESPONDENT.

Argued February 25, 1991—Decided June 4, 1991.

358

*Paul J. Hirsh* argued the cause for appellant Gruzen and Partners, etc. (*Whipple, Ross & Hirsh* attorneys).

*Frank P. Leanza* argued the cause for appellant Isadore and Zachary Rosenfield, Associated Architects, etc. (*McDermott & McGee,* attorneys).

*Bruce D. Shoulson* argued the cause for respondent Newark Beth Israel Medical Center (*Lowenstein, Sandler, Kohl, Fisher & Boylan,* attorneys, *Mary Jo Reich,* on the brief).

*Peter A. Piro* argued the cause for respondent Lev Zetlin Associates, Inc. (*Haskins, Hack, Piro, O'Day, Merklinger & Wallace,* attorneys).

The opinion of the court was delivered by

GARIBALDI, J.

This case draws our attention once more to the application of the statute of repose, *N.J.S.A.* 2A:14–1.1, which limits to a ten-year period the exposure to liability of designers, planners, and builders for damages to person and property arising out of the defective and unsafe condition of an improvement to real property. *See E.A. Williams v. Russo Dev. Corp.,* 82 *N.J.* 160, 167, 411 *A.*2d 697 (1980). In *E.A. Williams,* we held that the statute applies only to "deficiencies" that involve or create " 'defective and unsafe' conditions," *id.* at 170, 411 *A.*2d 697, and that it does not apply to a defect that "may well cause the owner dismay and economic injury" but does not "create a safety hazard or cause injury to persons or property." *Id.* at 172, 411 *A.*2d 697.

We must decide whether an architect's defective design that required the owner to incur substantial costs to redesign the

building so that it could be used safely for its intended purpose caused the owner merely "dismay and economic injury" or created an "unsafe and defective" condition. *Ibid.*

I

Since 1928, plaintiff, Newark Beth Israel Medical Center ("Hospital" or "Medical Center") has been expanded in phases pursuant to its Master Plan. In December 1968, the Medical Center contracted with defendant Gruzen and Partners, d/b/a Gruzen, Samton, Steinglass, Architects (Gruzen), to design Phase III of the Master Plan, which included construction of a new four-story building with a fifth-floor structural shell and a central elevator/mechanical core. According to plaintiff's complaint, Gruzen also agreed "to design Wings A and B of the new building and the central elevator/mechanical core, and to design the construction requirements thereto to provide for the expansion of said wings and elevator to ten (10) stories at a future date." The Executive Vice President of the Hospital also certified that Gruzen was charged "with the responsibility to design the foundation and structural steel supports of Wings A and B and the central elevator/mechanical core to accommodate the future expansion." The issuance of a Certificate of Occupancy on November 18, 1974 marked the completion of Gruzen's work on Phase III.

Twelve years later in 1986, when preparing to construct the remaining floors, the Medical Center's consulting engineer discovered a problem with the already-constructed five-story base—it could not safely support the planned additional stories. While preparing to proceed with the Master Plan, the engineer had discovered that the base structure's design was "structurally incapable of supporting additional floors due to inadequate provisions for wind allowances." The Hospital spent approximately $1,000,000 to ensure that "the building was safe for its entire intended function."

The Medical Center sued Gruzen in 1988 to recover costs incurred in the repair, redesign, and reconstruction of the base structure so that it could support the planned extension. The trial court granted Gruzen's motion for summary judgment, holding that *N.J.S.A.* 2A:14–1.1 precluded the action because more than ten years had passed since Gruzen had completed the design for Phase III. Because Gruzen's design would have made the completed ten-story building dangerously susceptible to the wind, the court held that a hazardous condition existed that rendered the building "unsafe" under the statute.

The trial court based its ruling on the impact of the defective design on the entire ten-floor structure. The court reasoned that the condition created by the design defect had to be evaluated in light of its effect on the structure's intended use—the anticipated ten-story building. As the court stated in its oral opinion, "the original master plan, and the agreement and the intent between Beth Israel and all of the people was for a ten-story building. Since that ten stories can't be put on safely, the original problem was with the first five stories, and it doesn't matter whether the condition is now or subsequent."

The Appellate Division reversed. Taking a much more narrow approach to the issue, the panel based its decision on the impact of the defective design on the building as currently standing. The present structure, unchanged, would not cause any injuries to persons or property. The court saw "no cause to call the original structure 'defective and dangerous' merely because a million-dollar reinforcement project was necessary," even though it believed that "if the alleged defect had not been discovered until after the additional floors had been constructed, the building might have been 'defective and unsafe.' " The Appellate Division relied on the distinction we drew in *E.A. Williams v. Russo Development Corp., supra,* 82 *N.J.* at 160, 411 *A.*2d 697, between an unsafe condition and the mere functional impairment (and the accompanying economic loss) found in that case.

We granted Gruzen's petition for certification, 122 *N.J.* 403, 585 *A.*2d 401 (1990), and now reverse.

## II

### A.

*N.J.S.A.* 2A:14–1.1, enacted in 1967, is similar to legislation enacted in thirty other states. We have discussed its history and purpose on several occasions. *See E.A. Williams v. Russo Dev. Corp., supra,* 82 *N.J.* at 164–65, 411 *A.*2d 697; *O'Connor v. Altus,* 67 *N.J.* 106, 117, 335 *A.*2d 545 (1975); *Rosenberg v. Town of North Bergen,* 61 *N.J.* 190, 195–98, 293 *A*2d 662 (1972).

Although the legislative history regarding the enactment of *N.J.S.A.* 2A:14–1.1 is "meager and unrevealing," *Rosenberg, supra,* 61 *N.J.* at 194, 293 *A.*2d 662, we have concluded that the Legislature enacted the statute in response to the expanding application of the "discovery rule" to new types of tort litigation, the abandonment of the "completed and accepted rule" (by which contractor and architect liability for negligence ended on completion of the work and its acceptance by the property owner), and the expansion of strict liability in tort for personal injuries caused by defects in new homes to builder/sellers of those homes. *O'Connor v. Altus, supra,* 67 *N.J.* at 117–19, 335 *A.*2d 545; *see also Rosenberg, supra,* 61 *N.J.* at 194–98, 293 *A.*2d 662 (discussing the impact those developments had on the Legislature). Those judicial trends created the potential for liability for injuries occurring long after design and construction professionals had completed a project. The statute " 'meant to cut back on the potential of this group to be subject to liability for life.' " *Ramirez v. Amsted Indus.,* 86 *N.J.* 332, 356, 431 *A.*2d 811 (1981) (quoting *County of Hudson v. Terminal Constr. Corp.,* 154 *N.J.Super.* 264, 268, 381 *A.*2d 355 (App.Div.1977), *certif. denied,* 75 *N.J.* 605, 384 *A.*2d 835 (1978)).

■    Although *N.J.S.A.* 2A:14-1.1 is designed to limit the time during which one can sue design and construction professionals, it "is not a conventional statute of limitations. In fact, it is not really a statute of limitations at all, at least in the traditional understanding of that term." *E.A. Williams v. Russo Dev. Corp., supra,* 82 *N.J.* at 167, 411 *A.*2d 697. The statute "does not 'bar' a remedy in the sense of providing an injured person a certain time to institute suit after the 'accrual' of a 'cause of action.'" *Ibid.* Rather, injuries occurring more than ten years after the completion of services simply form no basis for recovery. The statute prevents what could have been a cause of action related to those services from ever arising. *Ibid.; see also Rosenberg, supra,* 61 *N.J.* at 199, 293 *A.*2d 662 (holding that the expiration of 10 years makes the "harm that has been done * * * *damnum absque injuria*—a wrong for which the law affords no redress"). Thus, *N.J.S.A.* 2A:14-1.1 is best described as a statute of repose. *E.A. Williams v. Russo Dev. Corp., supra,* 82 *N.J.* at 167, 411 *A.*2d 697; *see also Ramirez v. Amsted Indus., supra,* 86 *N.J.* at 355, 431 *A.*2d 811 (holding that "the statute cuts off all claims after ten years ... irrespective of the date of injury"); *O'Connor v. Altus, supra,* 67 *N.J.* at 121–22, 335 *A.*2d 545 (characterizing the statute as a "hybrid" that prevents both new actions from accruing after ten years and suits after ten years on actions accruing before the ten-year mark).

To achieve the legislative goal of providing a reasonable measure of protection against expanding liability for design and construction professionals, we have construed the statute broadly.

> If the condition to which the Legislature addressed itself was this extension of potential liability, then there seems no reason not to include within the favor of the statute all to whom this condition may adhere whether they be planners and builders of structures, roads, playing fields or aught else that by broad definition can be deemed "an improvement to real property." We prefer to read the statute, consonant with what we thus judge to have been the legislative intent, as applying to all who can, by a sensible reading of the words of the act, be brought within its ambit. [*Rosenberg, supra,* 61 *N.J.* at 198, 293 *A.*2d 662.]

*See also O'Connor v. Altus, supra,* 67 *N.J.* at 118, 335 *A.*2d 545 (following approach of *Rosenberg*).

## B.

Although we construe *N.J.S.A.* 2A:14–1.1 broadly, only designs that result in unsafe and defective conditions implicate the statute. Each party cites *E.A. Williams v. Russo Dev. Corp., supra,* 82 *N.J.* 160, 411 *A.*2d 697, as supporting its position. Plaintiff asserts that *N.J.S.A.* 2A:14–1.1 does not apply because the design defect is merely a functional impairment akin to the surveying error in *E.A. Williams.* Plaintiff's argument rests on its position that the design flaw does not pose a threat to the building as presently constructed. Only when the additional stories are added does the building become unsafe. According to plaintiff, the statute does not address hypothetical liability; it applies only to a currently-dangerous condition. Therefore, the suit does not arise out of a defective and unsafe condition but one made to recoup the expenditures needed to correct the defendant's failure to accommodate the future expansion of the building. Defendant rejects plaintiff's contentions, arguing that the project had been conceived and designed for ten floors. The core of the complaint filed by the plaintiff is that defendant contracted to design the base structure to support the Hospital's intended expansion of the building to ten stories, and that defendant's design, which did not allow for a safe completion, was defective.

The building could not be completed because defendant's design rendered the additional stories dangerously vulnerable to the wind if added to the presently-constructed base. In order to use the building as intended, the base had to be made safe. Twelve years after Gruzen completed its design, the Medical Center undertook remedial work to reinforce the steel of the existing structures to bolster them against the wind in order to complete the planned expansion.

We find that the functional impairment in this case relates directly to an unsafe condition. Plaintiff's entire action is based on defendant's failure to design the building so that the planned expansion could be undertaken safely. To consider the property not as a whole building but as separate entities is a fiction and, as properly determined by the trial court, was never the intention of the parties.

If improvements to property made in accordance with a defective design would render that property unable to be used for the purpose for which it was designed, without being or becoming unsafe, the statute is triggered. That approach comports with common sense. It also distinguishes this case from *E.A. Williams.*

Safety considerations and problems not present in *E.A. Williams* dominate here. In *E.A. Williams,* a building was simply in the wrong place. Unchanged it was not unsafe for its intended purpose but it was merely inefficient for its proposed use. The building had not been defectively designed so as to create a hazard for those attempting to use it; rather, it merely created antagonism between neighbors. In contrast, the five-story building here makes the intended and contemplated expansion unsafe. Alterations to this building, unlike the ones in *E.A. Williams,* go beyond expensive and inconvenient changes based on efficiency to measures necessary and proper to ensure safety.

Several observations drive our analysis in this case. Safety considerations were the sole reason why the remedial structural work was performed in this case. The fact that the Medical Center reinforced the building before bringing suit cannot change the nature of the defect from "hazardous" to "functional." Nor can the fact that construction contemplated two stages rather than one cause that transformation. Moreover, we again recognize that the Legislature, by enacting *N.J.S.A.* 2A:14–1.1, "sought to provide what it deemed to be a reasonable measure of protection [for architects] against this greater

hazard" of increased and lingering liability. *Rosenberg, supra,* 61 *N.J.* at 198, 293 *A.*2d 662. "The statute, then, is broad and offers wide-ranging protection, especially to those whose potential liability has been increased by" recent developments in the law. *O'Connor, supra,* 67 *N.J.* at 118, 335 *A.*2d 545.

■ Those observations lead us to the same conclusion that we have reached previously in this area. "[T]he statute was intended to terminate the liability of all persons who might be responsible for the existence of 'defective and unsafe' conditions through their negligent design, plan or construction of an improvement to real property." *E.A. Williams, supra,* 82 *N.J.* at 169, 411 *A.*2d 697. The Legislature settled on ten years as a fair cut-off date. *Id.* at 169, 411 *A.*2d 697; *see also Rosenberg, supra,* 61 *N.J.* at 201, 293 *A.*2d 662 (supporting ten-year cut-off with a quote from *Developments in the Law: Statute of Limitations,* 63 *Harv.L.Rev.* 1177, 1185 (1950)—" 'there comes a time when [the defendant] ought to be secure in his reasonable belief that the slate has been wiped clean' "); *Hopkins v. Fox & Lazlo Realtors,* 242 *N.J.Super.* 320, 327, 576 *A.*2d 921 (App.Div.1990) (holding that an architect "should be able to look back ten years and one day after the completed performance of his [or her] work and know there is repose from liability"). We will not extend it.

Of course, we understand that "*N.J.S.A.* 2A:14–1.1 does not provide that all claims against planners and designers … vanish after the passage of ten years." *E.A. Williams, supra,* 82 *N.J.* at 170, 411 *A.*2d 697. That, however, in no way changes that this one did. Gruzen's work involved "a situation hazardous to the well-being and safety of persons or property coming into contact with the improvement or structure," *id.* at 171, 411 *A.*2d 697, in the course of using or preparing to use the structure for its intended purpose, a ten-story hospital building. The safety concerns raised for floors six through ten, which will be "property coming into contact with the improvement," *ibid.,* sprang from the defective design of the base floors. The

present condition of the base floors creates an unsafe "situation hazardous to the well-being and safety of persons and property [like the new floors] coming into contact with the improvement." *Ibid.* Liability for such a hazard is precisely what the Legislature sought to foreclose after ten years.

### III

As evidenced by the foregoing, we hold that *N.J.S.A.* 2A:14–1.1 applies to this situation. *E.A. Williams v. Russo Dev. Corp., supra,* 82 *N.J.* at 160, 411 *A.*2d 697, is distinguishable. As is readily apparent, "functional impairment" is not some talisman that by its mere invocation wards off the statute's repose. Rather, that phrase can be and has been used in various contexts (and actually first appears in this line of cases in the description of the young plaintiff's injuries in *O'Connor, supra,* 67 *N.J.* at 111, 335 *A.*2d 545). Every defective and unsafe condition will impair a building functionally, in that one cannot use it if it is unsafe. The converse, however, is not necessarily true—every functional impairment does not necessarily carry with it an unsafe and defective condition. That is one of the distinctions made by *E.A. Williams, supra,* 82 *N.J.* at 160, 411 *A.*2d at 697.

In this case the design created an unsafe condition that unless corrected prevented the property from being used for its intended purpose. In such a case, the statute applies.

We reverse the judgment of the Appellate Division and reinstate the decision of the trial court.

CLIFFORD, J., dissenting.

The result in this case turns on the meaning of *N.J.S.A.* 2A:14–1.1. That statute bars a late "action * * * to recover damages for any deficiencies in the design * * * of an improvement to real property * * * arising out of the defective and unsafe condition of" that improvement. The issue before us is whether the presence of an "unsafe condition" should be deter-

mined by reference to the defect's anticipated effect on a project as planned, as defendants claim, or from its present capacity for producing injury, as plaintiff argues.

The language of the statute, quoted above, is not so plain as to yield the answer. To determine the legislative intent, therefore, we must look beyond the words of the enactment to statements of policy, concepts of reasonableness, and legislative history. *See Shapiro v. Essex County Bd. of Chosen Freeholders*, 177 *N.J.Super.* 87, 93, 424 *A.*2d 1203 (Law Div.1980), *aff'd*, 183 *N.J.Super.* 24, 443 *A.*2d 219 (App.Div.), *aff'd*, 91 *N.J.* 430, 453 *A.*2d 158 (1982).

The language of *N.J.S.A.* 2A:14–1.1 is derived in large part from a model statute endorsed by design- and construction-trade organizations. *E.A. Williams, Inc. v. Russo Dev. Corp.*, 82 *N.J.* 160, 164–65, 411 *A.*2d 697 (1980). (See Comment, *Limitation of Action Statutes for Architects and Builders— Blueprint for Non-action*, 18 *Cath.U.L.Rev.* 361, 365 n. 31 (1969), for the text of the model statute.) The model statute is not limited to claims "arising out of the defective and unsafe condition" of the improvement; rather, its wording suggests that it furnishes protection from liability for *any* claim based on a design defect. *E.A. Williams, Inc., supra*, 82 *N.J.* at 169, 411 *A.*2d 697. Because our Legislature chose to add the "defective and unsafe" limiting clause, this Court has interpreted our statute to require "not only * * * that damages arise from deficiencies in design, plan, supervision, or construction of the improvement, but also that those deficiencies be related to a resulting condition [that] is *itself* 'defective and unsafe.' " *Ibid.* (emphasis added).

The legislative history of *N.J.S.A.* 2A:14–1.1, described by Justice Mountain as "meager and unrevealing," provides no insight into the intent of the lawmakers. See *Rosenberg v. Town of North Bergen*, 61 *N.J.* 190, 194, 293 *A.*2d 662 (1972). However, given the anxiety over the courts' expansion of architects' and builders' liability, see *ante* at 362–363, 590 *A.*2d

at 1173–1174, "it appears that [the statute's] major impetus was to limit liability of designers, planners, and builders for damages from injury to person and property, consequences that ordinarily flow from unsafe conditions." *E.A. Williams, Inc., supra,* 82 *N.J.* at 171, 411 *A.*2d 697. "The statute was meant to preclude the liability of those whose work created a situation hazardous to the well-being and safety of persons or property coming into contact with the improvement or structure." *Ibid.*

In light of this Court's perception that the purpose of the statute was to rein in judicially-expanded liability in tort, the addition of the "defective and unsafe" limiting clause to the language of the model statute demonstrates that the Legislature was willing to go only so far in protecting the interests of design and construction professionals. As noted above, the model statute proposed that after a certain number of years those groups be afforded complete protection from any liability based on a design defect. By adding the limiting clause to the statute, however, the Legislature chose not to provide protection from any liability except for that related to personal-injury and property-damage loss.

Exposure to liability of that sort obtains only when the defective condition is currently capable of inflicting injury. Liability for personal injury and property damage does not arise while the danger that the design defect poses is only abstract—and the only "danger" that is present when defendants' error is viewed in the context of the ten-story building called for in the hospital's Master Plan is an abstract or potential one at best. I believe that for a defective condition to be deemed "unsafe" for purposes of the statute of repose, the Legislature intended that the condition currently be capable of causing injury. Interpreting *N.J.S.A.* 2A:14–1.1 as does the majority expands the statute's application to the sort of liability the Legislature specifically refused to include, as evinced by its failure to adopt the broader coverage of the model statute.

The Court has considered previously other factors frequently advanced in support of statutes of repose such as the one before us:

1. Potential liability throughout professional life, vulnerability to tenuous claims, defense expense, and onerous record keeping reflect the need for some limitation of liability.

2. Passage of time severely handicaps the defense of an action. Even aside from the obstacles of faded memories, unavailable witnesses and lost evidence, problems of proof are extremely complex not only because of the joint effort involved in initial construction, but also due to any inadequate maintenance, improper use, or improvements and services that may follow. The architect and builder have no control over the owner, whose negligence may be the real cause of dangerous conditions.

3. The injured party retains his remedy against the owners after the statutory period. With the passage of time, the probability increases that improper maintenance, rather than faulty design or construction, is the proximate cause of injury. Thus, some reasonable time limitation for suit is a fair compromise, and statistical data show that 84.3 percent of all claims against architects and builders would be brought within four years. [*O'Connor v. Altus*, 67 *N.J.* 106, 121, 335 *A.2d* 545 (1975) (quoting Comment, *supra*, 18 *Cath.U.L.Rev.* at 384).]

None of those concerns is implicated when *N.J.S.A.* 2A:14–1.1 is interpreted to apply only when the design defect creates a tangibly-unsafe condition. Concerning the first factor, because no danger yet exists, there is no potential for injury, and with no potential for injury, there is no danger of unlimited liability. Only when the defective condition is directly capable of causing harm is there potential for such liability. The Legislature's determination that claims "arising out of the defective and unsafe condition of an improvement to real property," *ibid.*, are barred if not instituted within ten years of construction can be understood to encompass only conditions that had the capacity to cause injury. The potentially-unsafe condition in this case would have acquired that capacity only after the hospital had undertaken construction of the building's final phase. It makes little sense to impute to the Legislature an intent to require such a claim to be filed during a period when the potentially-defective condition was dormant, incapable of causing harm.

The thought behind the second point is that the architect has no control over an owner whose neglect or misuse, as time

passes, is more likely to be the actual cause of the hazard than is a design defect. That circumstance is not a concern when the form of the building in which the defect is capable of causing injury, not having been built, cannot be subjected to owner abuse.

The third factor combines the likelihood of owner neglect with the owner's continued susceptibility to liability to an injured party. That concern is not material here: there is no third-party "injured" entity, and the owner has only these defendants to whom it may turn to recoup its expenses.

To interpret the statute to require that for a defective condition to be "unsafe," the flaw must present a palpable, existing, present, real-honest-to-goodness danger is simply more reasonable. Especially is that so in view of the facts of this case. Defendants' duty was to design the base structure of a multiple-phase building. The suit against them is for a deficiency in that design. The mistake they made did not affect the safety of their project. Considering the yet-to-be-completed status of the building, the majority's analysis rests on hypothetical liability that would have arisen had the building been completed without the necessary reinforcement. Common sense suggests that the statute is directed toward how the allegedly defective condition now affects the phases of the building already in place, not how it would affect some make-believe not-yet-completed structure.

Finally, the majority claims that defendants' work "involved 'a situation hazardous to the well-being and safety of persons or property coming into contact with the improvement or structure,'" and that the planned expansion "will be 'property coming into contact with the improvement'" addressed by the statute. *Ante* at 366–367, 590 *A.*2d at 1175–1176 (quoting *E.A. Williams, Inc., supra,* 82 *N.J.* at 170, 411 *A.*2d 697). That would be the case had the structure been built so that its inadequacies presented a danger to persons or property. In that situation the design defect's potential for causing personal

injury or property damage would be real. However, because the defect, at the time it was corrected, did not endanger the structure itself, other property, or persons, plaintiff's claim seeking to recoup repair expenses cannot be deemed to be of the sort "arising from a defective *and unsafe* condition." The performance of remedial work indicates a defective condition; it does not necessarily point to the presence of a hazard. Here, an unsafe condition simply did not exist: if the hospital had foregone its planned expansion, no remedial effort would have been necessary because nothing and no one was threatened.

The majority opinion sets the stage for potentially erratic evaluations of less-than-cosmic propositions, *i.e.*, whether a defect is an "unsafe condition" rather than a "functional impairment." Some lawyers and judges may enjoy the indoor sport of picking apart a problem of that sort, but I would avoid such a contest by reading *N.J.S.A.* 2A:14–1.1 to be *triggered* on completion of services but not to *apply* until the defect becomes capable of producing injury. Thus, if the injury-producing capability is realized at any time after ten years from the performance of services, the statute will have been triggered and will be applicable.

In sum, *N.J.S.A.* 2A:14–1.1 offers repose ten years after services are performed for claims alleging design defects "arising out of the defective and unsafe condition of an improvement to real property." In adopting that language the Legislature rejected an interpretation of the statute that would expand its coverage to liability that is not related to personal injury or property damage. For purposes of applying *N.J.S.A.* 2A:14–1.-1, therefore, a defective condition should be considered unsafe only when it presents the possibility of creating liability of that sort. For it to do so, the defective condition must be directly capable of producing injury.

I would affirm.

*For reversal and reinstatement* —Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN and GARIBALDI—5.

*For affirmance* —Justices CLIFFORD and STEIN—2.